IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RANDA MULANAX, for herself and all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § | 1:15-CV-1189 RP |
| STEADFAST MANAGEMENT COMPANY, INC., and SIR MONTECITO, LLC, | § § § § | |
| Defendants. | § § | |

**ORDER**

Before the Court are Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and the responsive filings thereto. Having considered the parties' submissions, the record in this case, and the applicable law, the Court issues the following order.

**I. BACKGROUND**

Plaintiff Randa Mulanax brings this action against Defendants Steadfast Management Company, Inc. ("Steadfast") and SIR Montecito, LLC ("Montecito"). Steadfast is the "primary operating entity" and "apartment house management-arm" of Defendants' parent company, Steadfast Companies. (Dkt. 10, ¶ 12). Montecito is the legal titleholder of Montecito Apartment Homes ("MAH"), located at 3111 Parker Lane, Austin, TX 78741. (Dkt. 10, ¶ 21). According to Plaintiff, Steadfast Companies formed Montecito as a shell entity in order to serve as the legal titleholder to the MAH complex. (Dkt. 10, ¶ 14). However, Montecito "lacks actual input into the actual operation" of the complex, and it is in reality Steadfast "that makes the decisions, and calls the shots at the apartment houses." (Dkt. 10, ¶ 14). Plaintiff alleges that "[a]ny tenant in Texas living at a Steadfast-managed apartment property deals with Defendant Steadfast as the purported landlord,"

1

(Dkt. 10, ¶ 15), and as illustrative of this contention, lists a host of tasks that Steadfast personnel are trained to carry out, (Dkt. 10, ¶ 16). Steadfast further "sets the policies (the rules) with which the tenants at the apartment houses must comply and enforces those rules as a landlord." (Dkt 10, ¶ 16).

On or about June 30, 2015, Plaintiff signed a one year lease with Montecito to rent a small one-bedroom apartment unit at the MAH complex. (Dkt. 10, ¶ 21). The lease agreement represented that Plaintiff would be billed for water and wastewater on a "submetered" basis, that the average monthly water and wastewater bill for residents was $34.23, and that Plaintiff would be assessed a 9% "service fee" each month for "monthly water-service charges." (Dkt. 10, ¶ 22). These charges were billed to Plaintiff by Steadfast either directly or through a third-party, Conservice Management & Utility Billing ("Conservice"), with all payments collected by Steadfast. (Dkt. 10, ¶¶ 17, 24).

Plaintiff has paid the charges and fees assessed on all bills. (Dkt. 10, ¶ 22). She now brings this action against Montecito and Steadfast. She alleges that they have in three ways violated the Texas Water Code ("TWC") and the administrative rules promulgated pursuant to that statute by the Public Utility Commission of Texas ("PUC"). First, Plaintiff claims that Steadfast and Montecito have violated the TWC and PUC rules by adding a nine percent service fee charge to her water and wastewater costs while using an "allocation methodology," instead of a "submetered methodology," to calculate her bill. (Dkt. 10, ¶ 42). Second, Plaintiff alleges that Montecito and Steadfast have charged her significantly in excess of the amount they pay to the City of Austin for water and wastewater services, again in violation of the TWC and PUC rules, which limit what charges may be passed on to a tenant. (Dkt. 10, ¶¶ 47–51 ). Lastly, Plaintiff contends that Montecito and Steadfast have failed to register with the PUC, rendering all water and wastewater charges to tenants at the MAH complex illegal. (Dkt. 10, ¶¶ 53–54). Plaintiff seeks recovery of statutory damages equal to three times the amount of all overcharges, a civil penalty of one month's rent for each violation,

reasonable attorney's fees, prejudgment and postjudgment interest at the highest rate allowed by law, and costs of court. (Dkt. ¶ 78).

In addition to Plaintiff's claims under the TWC and PUC rules against both Steadfast and Montecito, she alleges against Montecito a breach of contract claim for Montecito's failure to use the contractually agreed upon method of calculating her water and wastewater bills. (Dkt. 10, ¶¶ 79–80). She seeks recovery from Montecito of all amounts assessed in excess of what would have been collected if the water and wastewater costs had been calculated on a submetered basis, reasonable attorney's fees, prejudgment and post judgment interest at the highest rate allowed by law, and costs of court. (Dkt. 10, ¶ 80).

In response, Steadfast and Montecito have filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking dismissal of all of Plaintiff's claims.

## II. APPLICABLE LAW

### A. Standard of Review: Federal Rule of Civil Procedure 12(b)(6)

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *accord Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court therefore will not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010).

Rather, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining the plausibility of a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not '"show[n]"'—'"that the pleader is entitled to relief."'" *Iqbal*, 556 U.S. at 679. (quoting Fed. R. Civ. P. 8(a)(2)).

**B. The Texas Water Code**

The TWC governs a vast array of issues of which water and wastewater utility regulation form but a tiny part. This case involves Title 2 ("Water Administration"), Subtitle B ("Water Rights"), Chapter 13 ("Water Rates and Services"), Subchapter M ("Submetering and Nonsubmetering for Apartments and Manufactured Home Rental Communities and Other Multiple Use Facilities"). Subchapter M was "enacted and later amended . . . to specify how apartment owners are allowed to pass-through their water utility costs to tenants." *Schilling v. Mid-America Apt. Cmtys., Inc.*, No. A-14-CV-1049-LY, 2015 WL 4041652, at *1 (W. D. Tex. Jul. 1, 2015). The general idea is that property owners are not to profit from the provision of water and wastewater utility services to their tenants. *See e.g.*, Tex. Water Code § 13.503(b) ("[A]n apartment house owner . . . may not impose on the tenant any extra charges, over and above the cost per gallon and any other applicable taxes and surcharges that are charged by the retail public utility to the owner."); Tex. Water Code § 13.5031(3) ("[A]n owner may not impose additional charges on a tenant in excess of the actual charges imposed on the owner . . . for utility consumption by the . . . apartment house."). To that end, the statute directs the PUC to enact rules and regulations in accordance with a number

of basic guidelines. In order to enforce the PUC's rules, § 13.505 allows that "[i]n addition to the enforcement provisions contained in Subchapter K," an "owner" as defined under Subchapter M may be held liable for "violat[ing] a rule of the utility commission regarding submetering of utility service . . . or nonsubmetered master metered utility costs." Tex. Water Code § 13.505.

## III. DISCUSSION

Defendants first allege that the enforcement provision of Subchapter M does not apply to property management companies like Steadfast. They further seek dismissal of all of Plaintiff's other claims against Montecito. The Court addresses each of these arguments below.

### A. *Steadfast's Status Under the Texas Water Code*

Defendants assert that Steadfast does not qualify as an "owner" under Subchapter M of the TWC, and is therefore not subject to liability under the statute. (Dkt. 12 at 6). They ask that Steadfast therefore be dismissed as a party to these proceedings (Dkt. 12 at 6).

Subchapter M, comprising §§ 13.501–13.506 of the TWC, defines an "owner" as follows:

> "Owner" means the legal titleholder of an apartment house, manufactured home rental community, or multiple use facility and any individual, firm, or corporation that purports to be the landlord of tenants in the apartment house, manufactured home rental community, or multiple use facility.

Tex. Water Code Ann. § 13.501(5).

The parties do not dispute that Steadfast is not the legal titleholder of the MAH complex. They do, however, disagree as to whether Steadfast "purport[ed] to be a landlord of tenants" in the MAH complex. The statute does not explicitly define what it means to be a "purport to be a landlord," and so resolution of this question requires the Court engage in statutory construction.

### 1. Statutory Construction

In construing Texas statutes,[1] the Court must "ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) (citing *State, Tex. Parks & Wildlife Dep't. v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)). It must "enforce the statute 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 445 (Tex. 2009)). Analysis is limited to the plain, ordinary meaning of the words of the statute "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Id.* (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)) (internal quotation marks omitted). Statutory language must be understood "while looking to the statute as a whole, rather than [at] 'isolated provisions.'" *Id.* (quoting *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). A court must "endeavor to read the statute contextually, giving effect to every word, clause, and sentence." *Id.* (quoting *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013)).

"[W]hen a statute uses a word that it does not define, [the Court's] task is to determine and apply the word's common, ordinary meaning." *Id.* at 563. "To determine its *common, ordinary* meaning, [the Court should] look to a wide variety of sources, including dictionary definitions, treatises and commentaries, [the Texas Supreme Court's] prior constructions of the word in other contexts, the use and definitions of the word in other statutes and ordinances, and the use of the words in [Texas'] rules of evidence and procedure." *Id.* (emphasis in original); *accord* Tex. Gov't Code

---

[1] Analysis of this claim requires the interpretation of Texas law. When adjudicating claims for which state law provides the rules of decision, this Court is bound to apply the law as interpreted by the state's highest court. *Barfield v. Madison Cty.*, 212 F.3d 269, 271–72 (5th Cir. 2000). If the state's highest court has not definitively ruled on the issue in question, "it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Id.* at 272 (quoting *Transcon. Gas v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). An intermediate state appellate court's decision is binding unless this Court is "convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 272 (internal quotation marks omitted); *Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 354 (5th Cir. 1998). Federal courts are not to "expand state law beyond its presently existing boundaries." *Barfield*, 212 F.3d at 272.

§ 611.023. The Court will therefore "begin [its] analysis with the [TWC's] words and then consider the apparent meaning of those words within their context." *Id.* at 562.

**a. A Preliminary Issue: "And."**

First, however, the Court must address a preliminary issue raised by Defendants. They contend that the "and" in the TWC's definition of owner denotes that an owner must be *both* the legal titleholder of the property *and* purport to be the landlord of tenants. (Dkt. 16 at 3–4). This argument is dispositive of the issue because Steadfast is by both parties' admission not the legal titleholder of the MAH complex.

Defendants cite to the Fifth Edition of the American Heritage Dictionary to define "and"— "[t]ogether with or along with; in addition to; as well as." (Dkt. 16 at 3). These definitions, however, work against them; plugging those variants into the statute makes it clear that "and" does not mean "both . . . and" in this scenario:

> "Owner" means the legal titleholder of an apartment house, manufactured home rental community, or multiple use facility [together with/along with/in addition to/as well as] *any* individual, firm, or corporation that purports to be the landlord of tenants in the apartment house, manufactured home rental community, or multiple use facility.

Tex. Water Code § 13.051(5) (emphasis added).

The use of the word "any" directly following "and" removes any potential doubt regarding whether the "and" connotes Defendants' preferred interpretation. If the statute instead defined an owner as the legal title holder and *the* individual, firm, or corporation that purports to be the landlord, Defendants' interpretation might be more convincing.

Further, as explained in greater detail *infra*, the Court understands the word "landlord" in the statute to mean at least "one who owns and rents land, buildings, or dwelling units," or

something indistinguishably similar.[2] Defendants' argument is therefore that the statute should be read as follows: an entity is the owner of an apartment house only if it is *both* the legal titleholder (owner) of the apartment house *and* it purports to be the owner of and renting out the apartment house.

It is difficult to imagine a scenario in which the legal titleholder would not also purport in the lease to be the owner of and renting out the property. In that extremely common situation, there would be no need for the legal titleholder to purport to be the landlord of tenants, and the language of the statute as interpreted by Defendants would be pointless. *See Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 168 (Tex. 2016) (describing a court's duty to "give effect to all the words [in the statute] and not treat any [such] language as surplusage if possible." (quoting *Kallinen v. City of Houston*, 462 S.W.3d 25, 28 (Tex. 2015) (per curiam)).

Still, it is possible to imagine a scenario in which the legal titleholder conceals its identity while allowing another party to purport to be the owner of the property and the one to whom a tenant owes rent. Or perhaps, without the legal titleholder's knowledge, a third party might fraudulently rent out the titleholder's property. But if one of those scenarios were to occur, Defendants' interpretation of the statute would result in tenants having no recourse under Subchapter M when charged excessive utility service fees—there would be no party that was *both* the legal titleholder *and* purporting to be the landlord. In that scenario, Subchapter M's enforcement provision would be a dead letter. Such an outcome is the kind of "absurd result" that the Court must avoid in construing a statute. *See Jaster*, 438 S.W.3d at 570.

Accordingly, the Court rejects Defendants' reading of the TWC as requiring an entity be both the legal titleholder *and* be purporting to be the landlord of tenants in the property before it is an "owner."

---

[2] *See* Parts A.1.b–c *infra*. Defendants accept this definition. (Dkt. 12 at 7).

**b. Dictionary Definitions: "Purport" and "Landlord"**

      With that issue resolved, the Court turns to determining the common, ordinary meaning of the words of the statute. Typically, this begins with a review of dictionary definitions. *See id.* at 563. As mentioned *supra*, both parties agree that Steadfast is not the legal titleholder of the MAH complex, (Dkt. 10, ¶ 21); (Dkt. 12 at 6), and so it is not an "owner" under the first half of the TWC's definition. (Dkt. 10, ¶ 36–41); (Dkt. 12 at 6). But in the course of arguing that the second half of the statute's definition does not apply to Steadfast, Defendants have focused in large part on whether or not Steadfast *is* a landlord. *See* (Dkt. 12 at 7–8) (asserting that "Steadfast does not qualify as a 'landlord' within the dictionary definition of that term"). The statute, however, does not define an "owner" *as* a landlord, but instead defines an owner as the "legal titleholder" of a property as well as any individual or entity that "*purports* to be the landlord of tenants in the apartment house." Tex. Water Code § 13.501(5) (emphasis added). The question, then, is as follows: "what does it mean to 'purport' to be the 'landlord' of tenants in the apartment house?"

      First, "to purport" means to "to have the often specious appearance of being, intending, or claiming." *Purport*, The Merriam-Webster Online Dictionary (2016), http://www.merriam-webster.com/dictionary/purport. This definition is straightforward, and in harmony with the definitions of "to purport" in a number of other the dictionaries that the Court has consulted. *Accord Purport*, American Heritage Dictionary Online (2016), https://ahdictionary.com/word/search.html?q=purport ("To have or present the often false appearance of being or intending; claim or profess."); *Purport*, Oxford Dictionaries Online (2016), http://www.oxforddictionaries.com/us/definition/american_english/purport ("Appear or claim to be or do something, especially falsely; profess."); *Purport*, Macmillan Dictionary Online (2016), http://www.macmillandictionary.com/us/dictionary/american/purport ("[T]o claim or seem to be something or to do something, especially when this is not possible or true.").

Second, both parties provide the Court with slightly differing dictionary definitions of "landlord." Plaintiff in her complaint cites to an unknown version of Merriam-Webster and states the following:

> Merriam Webster [sic] defines "landlord" as follows: "(1) The owner of property leased or rented to another; (2) ***a person who rents lodgings: Innkeeper***." It defines "Innkeeper" as "(1) a proprietor of an inn; (2) ***a hotel manager***." Any fair reading of the word landlord as ordinarily defined and used around the U.S. includes a contract manager or management company that acts as the leasing agent and manager.

(Dkt. 10, ¶ 40) (emphasis in Complaint).

Plaintiff in her Response opposing Defendants' Motion to Dismiss then uses a different definition, this time citing to the Merriam-Webster Online Dictionary:

> To begin, dictionary definitions of "landlord" reach the manager of an apartment house. Merriam-Webster provides this full definition of the term "landlord": "(1) the owner of property (as land, houses, or apartments) that is leased or rented to another; (2) the **master** of an inn or **lodging house:** innkeeper." This second definition perfectly fits Steadfast.

(Dkt. 15 at 9) (emphasis in Response).

Defendants instead cite to the Fourth Edition of the American Heritage College Dictionary for their definition of landlord:

> 1. One that owns and rents land, buildings, or dwelling units.
> 2. A man who runs a rooming house or an inn; an innkeeper.

(Dkt. 12 at 6–7).

All definitions cited by the parties therefore involve two separate definitions of "landlord," with the first being consistently the same and the second differing slightly between dictionaries.[3]

---

[3] Plaintiff appears to accept that the second definition of landlord in both the Merriam-Webster and American Heritage College Dictionary dictionaries are essentially the same, or at the least very similar. *See* (Dkt. 15 at 11) ("[Defendants'] reasoning [regarding the MAH not being an inn or hotel, and Steadfast therefore not being an innkeeper] overlooks the fact that the very definition [Defendants have] quoted refers to one 'who runs a rooming house,' similar to the Merriam-Webster reference to a '"lodging house."').

Accordingly, the Court frames the question as follows: accepting the facts alleged in Plaintiff's complaint as true, can the Court reasonably infer that Steadfast "ha[d] the . . . appearance of being, intending, or claiming" to be (1) "the owner of property (as land, houses, or apartments) that was leased or rented to" Plaintiff or (2) "the master of an inn or lodging house: innkeeper?"[4]

The one other court to address the definition of an "owner" under Subchapter M of the Water Code applied the same reasoning in conducting its plain meaning analysis of the statute. *See Regehr v. Greystar Mgmt. Servs., L.P.*, A-15-CA-00501-SS, 2016 WL 1755873 (W.D. Tex. May 2, 2016).[5] In *Regehr*, the court applied the dictionary definitions of "landlord" and "purport" to assess the meaning of "owner" in Subchapter M. *Id.*, at *2–3. The defendant, Greystar Management Services, was the manager of the plaintiff's apartment house. Greystar's predecessor, which Greystar had acquired, was identified as the "dwelling owner" of the apartment house in an addendum to the plaintiff's lease. *Id.*, at *3. Because the dictionary definition of "landlord" indisputably includes the legal titleholder of the property, the court found that the plaintiff had pled sufficient facts to demonstrate that Greystar had "present[ed] the false appearance of being the legal titleholder of the property" and thus "purport[ed] to be the landlord." *Id.*, at *3.

The facts in *Regehr* were more straightforward than the facts in the instant case. The analysis, however, remains the same—do Plaintiff's alleged facts plausibly demonstrate that Steadfast purported to be the landlord of tenants at the MAH complex? Plaintiff claims that Steadfast "took over all the management and operations" at the MAH complex, (Dkt. 10, ¶ 14), and that it "makes

---

[4] The Court uses the Merriam-Webster definitions to construct this question. Using the definitions of "purport" and "landlord" from other dictionaries, such as the Oxford Dictionaries Online or the American Heritage Dictionary Online, yields immaterially different formulations.
[5] The *Regehr* order was the result of the plaintiff's Federal Rule of Civil Procedure 59(e) motion for reconsideration of the court's initial order to dismiss the plaintiff's claims against the property management company defendant on the basis that the defendant was not an "owner" under the TWC. *Regehr*, 2016 WL 1755873, at *1. The *Regehr* court did not look to other Texas statutes for guidance, and it applied the same meaning of "and" as the Court does today. There, however, the defendant had not disputed the plaintiff's characterization of the "and" in the statute as allowing for multiple owners. The court, noting that it was not its responsibility "to manufacture arguments in support of a party's position . . . accepted [the plaintiff's] interpretation for purposes of [its] analysis." *Id.* at *2 n.2.

the decisions[] and calls the shots . . . while Montecito lacks actual input into the actual operation of

the complex[]." (Dkt. 10, ¶ 14). Further, Plaintiff alleges that Steadfast employs "leasing consultants,

leasing coordinators, managers, bookkeepers, and others." (Dkt. 10, ¶ 15). It also purportedly "sets

the policies (the rules) with which the tenants at the apartment houses must comply and enforces

those rules," (Dkt. 10, ¶ 16), and "has ultimate responsibility and control over the landlord function,

including billing and collecting charges for water and wastewater utilities . . . [and] all payments were

collected by Defendant Steadfast." (Dkt. 10, ¶ 17). In addition, according to Plaintiff, Steadfast's

personnel, to benefit the MAH complex, allegedly:

> • Lease, market and advertise the apartment house.
> • Greet, assist, and qualify prospective residents.
> • Give property tours, answer telephone calls, and prepare application
> paperwork.
> • Communicate leases and community policies.
> • Maintain records of rental levels of comparable properties by
> preparing regular market surveys.
> • Take maintenance service requests from residents and follow-up on
> service calls.
> • Process move-ins and move-outs following company policies and
> procedures and guidelines established by federal, state, and local
> agencies.
> • Assist with supervision of all vacant apartment turnover
> procedures.
> • Perform annual unit inspections.
> • Collect rents and control delinquencies.
> • Serve legal documents and process and supervise all eviction
> proceedings.
> • Assist in the collection of all monies due to the Community (rents,
> damages, late fees, etc.) and the preparation of receipts.
> • Inspect the property on a regular basis and report all safety hazards,
> property damage, and needed repairs to maintenance staff.
> • Follow up on repairs to verify completion and compliance with
> OSHA, property insurance companies, government agencies, and
> company safety policies and risk management procedures.

(Dkt. 10, ¶ 16).

Accepting these facts as true, the Court finds it plausible that Steadfast purported to be the

landlord of tenants in the MAH complex under the first dictionary definition of landlord. In other

words, the Court can reasonably infer that by carrying out all the above activities, Steadfast "ha[d] the . . . appearance of being, intending, or claiming" to be the "the owner of property . . . that [was] leased or rented to" Plaintiff. As a result, the Court need not address whether Steadfast purported to be the landlord of tenants under the second dictionary definition of landlord. Defendants' motion to dismiss Steadfast as a defendant on the grounds that it is not an "owner" under the TWC is denied.

### c. Other Texas Statutes

The parties have both argued that definitions of "landlord" provided by the Texas Property Code ("TPC") should be considered in assessing the TWC's definition of "owner." (Dkt. 10, ¶ 39); (Dkt. 12 at 7–8). The Court disagrees, and will look only to the dictionary definition of "landlord" as discussed *supra* in construing the TWC's definition of "owner." However, because the parties have expended significant effort arguing the matter, the Court explains its reasoning.

In determining the common, ordinary meaning of an undefined word in a statute, the Court may look to "the use and definitions of the word in other statutes and ordinances, and the use of the words in [Texas'] rules of evidence and procedure." *Jaster*, 438 S.W.3d at 563 (emphasis in original); *accord* Tex. Gov't Code § 611.023.

Defendants point to the definition of "landlord" provided in TPC Chapter 92, which governs "residential tenancies." (Dkt. 12 at 8). That chapter states that "'Landlord' means the owner, lessor, or sublessor of a dwelling, but does not include a manager or agent of the landlord unless the manager or agent purports to be the owner, lessor, or sublessor in an oral or written lease." Tex. Prop. Code § 92.001(2).

Plaintiff instead directs the Court's attention to Subchapter D of Chapter 92, which governs "security devices"-related issues in the residential tenancy context and states that "'Landlord' means a dwelling owner, lessor, sublessor, management company, or managing agent, including an on-site manager." Tex. Prop. Code § 92.151(7). She also highlights TPC Chapter 94, which governs

13

"manufactured home tenancies," and states that "'Landlord' means the owner or manager of a manufactured home community and includes an employee or agent of the landlord." Tex. Prop. Code § 94.001(1).

What these definitions demonstrate is that the Texas Property Code's statutory scheme defines "landlord" very differently for varying kinds of tenancies and situations. Chapter 92, dealing with "residential tenancies," expressly excludes agents and managers from its definition of landlord barring certain narrow circumstances. Chapter 94, addressing "manufactured home tenancies," does the exact opposite, including without apparent limit both employees and agents of the owner in its definition of landlord. And the definition of landlord in Subchapter D of Chapter 92, dealing with "security devices" in the residential tenancy setting, applies only to that subchapter; the general definition otherwise controls. *Compare* § 92.001(1) ("Except as otherwise provided in this chapter . . . 'landlord' means . . . ." *with* § 92.151(7) ("In this subchapter . . . 'landlord' means . . . .").

It is not clear that the Legislature's reasons (whatever they may have been) for defining the term "landlord" so differently for each chapter of the TPC are applicable to the TWC. More importantly, the TWC is completely silent as to these distinctions. In construing a statute, the Court must give full meaning to the idea "that every word of a statute must be presumed to have been used for a purpose . . . [and] every word *excluded* from a statute must also be presumed to have been excluded for a purpose." *Rockwall* 246 S.W.3d at 628 (emphasis added) (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)). If anything, the Legislature's ability to define "landlord" in a variety of ways in the TPC is testament to the idea that, when needed, the Legislature can and will define "landlord" beyond its plain dictionary meaning. Accordingly, it would be inappropriate for the Court to superimpose the TPC's comprehensive statutory scheme onto the TWC in assessing the latter's statutory language.

14

**B. The Service Fee Claim**

Some background is required before addressing Plaintiff's service fee claim. The TWC and the PUC rules distinguish between two different types of water utility services: submetered and allocated. TWC § 13.503(c), under the heading of "Submetering Rules," states that "the rules shall authorize the owner or manager of a . . . apartment home to impose a service charge of not more than nine percent of the costs related to submetering allocated to each submetered rental or dwelling unit." TWC § 13.5031, titled "Nonsubmetering Rules," does not authorize any such service charge fee when an owner "prorat[es] or allocat[es] among tenants nonsubmetered master metered utility services." Tex. Water Code § 13.5031. The PUC rules track this understanding, as seen in Texas Administrative Code § 24.124, entitled "Charges and Calculations." First, § 24.124(a) directs that "[c]harges billed to tenants for submetered or allocated utility service may only include bills for water or wastewater from the retail public utility." Sections 24.124(d)(1) and 24.124(d)(2) then provide formulae for how an owner may calculate a tenant's "submetered utility service" bill for water and wastewater, with § 24.124(d)(3) allowing that an owner providing submetered utility services may "charge a service charge in an amount not to exceed 9% of the tenant's charge for submetered water and wastewaster service." Next, § 24.124(e) provides permitted ways of calculating a tenant's "allocated utility service" bill, but does not anywhere approve the charging of any service fee.

Accordingly, Plaintiff claims that Defendants provided her with allocated utility services and billed her for water and wastewater by way of an allocated methodology, meaning that the additional utility service fee they charged her was impermissible under the TWC and the PUC rules. (Dkt. 10, ¶ 42); Tex. Water Code § 13.5031(3); Tex. Admin. Code § 24.124(a). To support her conclusion, Plaintiff attaches a number of her Conserve Utility Statements, which explain that her water bill is "based on the percentage of hot water [she] used compared to the other residents at [her] community. For example, if [she] used 5% of the hot water used by all residents, then [she was]

15

billed for 5% of all the water." (Dkt. 10, Ex. B). That bill is purportedly obtained as follows: First, a master meter measures the amount of water flowing from the public utility to the MAH complex. (Dkt. 10, ¶ 44). Second, a point-of-use submeter installed at her individual dwelling unit measures the amount of hot water, but not all water, used at the unit. (Dkt. 10, ¶ 44). Third, the billing company adds up all hot water used at all MAH units. (Dkt. 10, ¶ 44). Fourth, the billing company determines what percentage of the total hot water used is attributable to her individual dwelling unit. (Dkt. 10, ¶ 44). Fifth and lastly, the billing company applies that percentage to the total water used by the complex to calculate what amount of the total water used by the complex should be attributed and billed to her.

Plaintiff then points to the fact that this method of calculating a water bill is directly labeled as an "allocated utility service" methodology in the PUC rules. *See* Tex. Admin. Code §§ 24.124(e), (e)(2)(A)(5) (directing that one permissible method of calculating a tenant's "allocated utility service" bill is to multiply the "retail public utility's master meter bill for water," subject to certain deductions, by "the individually submetered hot or cold water usage of the tenant's dwelling unit divided by all submetered hot or cold water usage in all dwelling units").

In response, Defendants assert that the use of submeters as discussed *supra* constitutes statutorily submetering[6] such that a service fee may be imposed, (Dkt. 12 at 8–9), and that Plaintiff's reliance on the fact that the method of billing at issue is explicitly labeled as a method for calculating an "allocated utility service" bill in the PUC rules is "put[ting] form over substance." (Dkt. 16 at 6). They further point to the legislative history of TWC § 13.503(c) as verifying "that a landlord can impose a service charge up to nine percent if it uses submeters to offset the costs associated with submetering and maintenance, including the recurring costs of determining consumption, calculating

---

[6] To avoid confusion, the Court uses the term "statutorily submetering" going forward to refer to submetering that meets the requirements of the TWC and the PUC such that a property owner may permissibly charge the nine percent service fee at issue here.

and applying rates, and repairing, maintaining and reading meters." (Dkt. 12 at 8–9) (citing Texas Bill Analysis, S.B. 2126 (Aug. 4, 2009)).

Although Defendants nowhere mention the language of the TWC itself in making this argument, it is clear that they are asserting that the PUC rules are in conflict with the TWC. There is no other way to interpret their insistence that they are statutorily submetering and thus entitled to charge a nine percent service fee in light of the plain language of the PUC rules directly contradicting that conclusion.

Thus, to address the root of Defendants' argument, the Court must determine whether the PUC rules are a valid interpretation of the TWC's statutory commands. The Texas Supreme Court has adopted a "serious consideration" inquiry for assessing administrative agency rules. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011). Under this approach, a court should "generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Id.* (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).

The TWC does not directly define submetering, and Defendants' argument is plausible on its face insofar as the use of submeters can be linguistically understood to be "submetering." But the Court must also "consider the context in which . . . words appear" within a statute in assessing their common, ordinary meaning. *Jaster*, 438 S.W.3d at 566. Here, the statute does not use the word "submetering" in a way that comports with how Defendants wish it to be understood.

TWC § 13.502 is entitled "Submetering," and must be read with that title in mind. It dictates that the owner of any apartment house for which construction began after January 1, 2003, "*shall* provide for the measurement of the *quantity of water, if any,* consumed by the occupants of each unit through the installation of . . . submeters, owned by the property owner . . . for each dwelling unit . .

. [or] individual meters, owned by the retail public utility, for each dwelling unit." Tex. Water Code § 13.502(b) (emphasis added). The "Submetering" section also allows that owners of properties that began construction prior to January 1, 2003, "*may* provide for submetering of each dwelling unit or rental unit for the measurement of the quantity of water, if any, consumed by the occupants of that unit." *Id.* at § 13.502(a) (emphasis added).[7] Statutorily submetering thus involves the use of submeters to measure the *quantity of water, if any*, consumed by a dwelling unit.

The PUC rules reflect this understanding. Under the PUC rules, "[s]ubmetered utility service" is "[w]ater utility service that is master metered for the owner by the retail public utility and individually metered[8] by the owner at each dwelling unit; wastewater utility service based on submetered water utility service; water utility service measured by point-of-use submeters when all of the water used in a dwelling unit is measured and totaled; or wastewater utility service based on total water use as measured by point-of-use submeters." Tex. Admin. Code § 24.121(c)(12). Submetered utility service therefore involves individually submetering each dwelling unit or using "point-of-use submeters" if so placed as to measure "*all* of the water used in a dwelling unit." *See id.* at § 24.121(c)(12) (emphasis added); *cf. id.* at § 24.121(11) (defining a "point-of-use submeter" as "[a] device located in a plumbing system to measure the amount of water used at a specific point of use, fixture, or appliance, including a sink, toilet, bathtub, or clothes washer"). The formulae provided by the PUC rules for calculating a tenant's "submetered utility service" bill also involve charging for a tenant's actual water consumption. *See* Tex. Admin. Code § 24.124(d)(1) (explaining that an owner

---

[7] When read together, §§ 13.502(a)–(b) also dictate that a property owner may only use an allocated billing method if they began construction on their property prior to January 1, 2003.

[8] That the PUC meant "individually metered" here to refer to individual submeters that measure the total water consumed—not individual submeters the way Defendants use them—is apparent from the context, given that when using "point-of-use submeters" the property owner must provide for the measurement of "all water used" in a dwelling unit. The billing calculations permitted when providing submetered utility services also require using a tenant's actual consumption obtained from one of the submetered utility services methods. Further, the PUC's "Tenant Guide to Submetered Water or Wastewater Service" explains that "[s]ubmetered facilities have individual submeters or point-of-use submeters that are installed and owned by the property owner, not the local utility," which are used to "determine[] [a tenant's] actual water consumption to calculate [their] bill." *Tenant Guide to Submetered Water or Wastewater Service, available at* www.puc.texas.gov/consumer/facts/factsheets/waterfacts/TenantGuideSubmeteredService.pdf

may calculate "a tenant's submetered charges" through multiplying "the tenant's monthly consumption" by either (1) the owner's cost per gallon (i.e. "the retail public utility's total monthly charges for water service . . . divided by the total monthly water consumption measured by the retail public utility") or (2) the public retail utility's standard rate (i.e. "the volumetric rate charged by the retail public utility to the owner").

Accordingly, the PUC's classification of Defendants' method of water utility service billing as an "allocated utility service" methodology does not contradict the plain words of the TWC. Defendants' use of submeters does not allow them to measure a dwelling unit's actual water use; it merely allows an estimate of the dwelling unit's overall usage based on the occupants' use of *hot* water. It does not "provide for the measurement of the *quantity of water, if any,* consumed by the occupants of each unit through the installation of . . . submeters, owned by the property owner . . . for each dwelling unit." *See* Tex. Water Code §§ 13.502(a),(b) (emphasis added). If the occupants of a dwelling unit were to let their cold water run for an entire month, Defendants' use of submeters would not register that particular dwelling unit as having used a disproportionate amount of water, or even any water at all. Instead, when calculating each dwelling unit's bill, Defendants would merely "allocate" or "prorate" the extra water costs across all dwelling units based on each one's hot water use. *See* Tex. Water Code § 13.5031.

Additionally, the legislative history to which Defendants point states that the policy rationale behind requiring all Texas apartment houses built after January 1, 2003, to be statutorily submetered is to promote the conservation of water resources. Texas Bill Analysis, S.B. 2126 (Aug. 4, 2009); *accord* Tex. Water. Code § 13.503(a) ("The utility commission shall encourage submetering of individual rental or dwelling units by . . . building owners to enhance the conservation of water resources."). Specifically, the Bill Analysis explains:

> Submetering is the measure and billing of utility use, including water and waste water, in individual dwellings in a master-metered

> environment. The installation of submetering equipment within each
> apartment of a multi-tenant unit accurately measures resident
> consumption, allowing residents to be billed only for their *actual*
> consumption. When consumers are provided with an *accurate*
> *measurement* of their utility usage, they typically modify their behavior
> so as to decrease their consumption, and reduced consumption
> results in lower utility bills . . . Switching from a 'master meter'
> system to a submetering system requires installation of submeters by
> the owner of a complex as well as the recurring costs of *determining*
> *consumption*, calculating and applying rates, and repairing, maintaining,
> and reading meters, amongst other functions.

*Id.* (emphasis added).

It is in that posture—to encourage the conservation of water by exposing consumers to the price of their *actual* consumption—that S.B. 2126 amended the law "to allow owners and managers of apartment houses to assess a service charge for the submetering of water and wastewater services." *Id.* As already discussed, Defendants' alleged use of submeters does not allow for the accurate measurement of an individual dwelling unit's actual consumption.

Accordingly, the PUC rules are in harmony with the plain language of the TWC as well as the TWC's legislative history.[9] The Court therefore finds that Plaintiff has alleged sufficient facts, taken as true, from which it can reasonably infer that Defendants were not statutorily submetering and were therefore prohibited from charging an additional utility service fee. Defendants' motion to dismiss Plaintiff's impermissible service fee claim is denied.

### C. The Excessive Charges Claim

Plaintiff alleges that Defendants have violated TWC § 13.5031(3) and Texas Administrative Code § 24.124(a) by passing on to Plaintiff utility service charges that are "well in excess of any

---

[9] It could be argued that Defendants' method of billing, even if it does not place a tenant face-to-face with their actual water use, still reduces an apartment house's overall water consumption and therefore advances the policy underlying the TWC. But even if the language of the statute and the legislative history were ambiguous, the Court would likely still defer to the PUC's interpretation of that language because its interpretation is not unreasonable. *See TGS-NOPEC v. Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."); *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 625 (explaining that a court should give deference to an agency's reasonable interpretation of ambiguous language in a statute).

actual charges being imposed on Defendants by the utility." (Dkt. 10, ¶¶ 47–51).[10] Defendants counter that Plaintiff's allegations are "self-serving" and "mere[] guesses," (Dkt. 12 at 10), which do not allow the Court to "infer more than the mere possibility of misconduct," (Dkt. 12 at 10) (citing *Iqbal,* 556 U.S. at 679–80).

In order to substantiate her claim, Plaintiff begins by pointing out that her Conservice Utility Statements make it clear that the City of Austin ("Austin Water") provides water and wasterwater to the MAH complex. (Dkt. 10, ¶ 48; Dkt. 10, Ex. B). She also provides a City of Austin Multifamily Water Customer Rates document (the "Austin Water Rates document") that sets forth Austin Water's "standard monthly rate based on meter size, plus the rate for water (per 1000 gallons) and sewer (base plus an amount per 1000 gallons)." (Dkt. 10, ¶ 48); (Dkt. 10, Ex. C). The rate for water is calendar-based: $4.90 per 1,000 gallons for the months of November through June, and $5.39 per 1,000 gallons for the months of July through October (Dkt. 10, Ex. C).

As seen in the Conservice Utility Statements, Conservice—using the hot-water-allocation-method described *supra*—allegedly calculated that Plaintiff was responsible for 1430 gallons of water during the month of August, 2015. (Dkt. 10, Ex. B at 4).[11] It charged her $43.35 for that water, as well as a Water Base Charge of $1.43, for a total of $44.88. (Dkt. 10, ¶ 48; Dkt. 10, Ex. B at 4). But Plaintiff, applying the $5.39 per 1,000 gallons Austin Water Rate for the months of July through October, calculates that the actual cost of that water should have been $9.13, or approximately one-fifth of what she was actually charged. (Dkt. 10, ¶ 48). She claims that this demonstrates that she was

---

[10] TWC § 13.5031, which governs the standards by which the PUC should promulgate rules dealing with the allocation of utility services, states as follows: "[E]xcept as provided by this section, an owner or condominium manager may not impose additional charges on a tenant in excess of the actual charges imposed on the owner or condominium manager for utility consumption by the manufactured home rental community, apartment house, or multiple use facility." Tex. Water Code Ann. § 13.5031(3); *accord generally* Tex. Admin. Code § 24.124.

[11] Defendants argue that "nowhere does Plaintiff determine what percentage of the overall use of hot water at [the MAH complex] was attributed to her or take into account how much hot water was used by the property as a whole to figure out her proportionate share." (Dkt. 12 at 10). It is not clear why this matters, because Plaintiff alleges and the Conservice Utility Statement for August 2015 appears to support that her bill was based on the allocation to her of responsibility for 1430 gallons of the total water used at the MAH complex. *Cf.* Tex. Admin. Code § 24.124 ("The tenant's submetered charges must include the dwelling unit base charge and customer service charge, if applicable, and *the gallonage charge* and must be calculated each month as follows . . . ." (emphasis added)).

billed "far in excess" of the "actual charges imposed" on Defendants by Austin Water. (Dkt. 10, ¶50).

It is possible, however, that the difference between the $9.13 Plaintiff calculates she would owe purely for the water used, and the $44.88 she was actually charged, might be explained by Defendants' billing her for a number of permissible additional charges.[12] For example, the Austin Water Rates document provided by Plaintiff explains that the monthly charge for a master meter, irrespective of water use, is calculated by adding together the "Customer Charge," "Meter Charge," "Fire Protection Charge," and "Minimum Fixed Charge." (Dkt. 10, Ex. C). These sound like they comprise a "customer service charge" that a property owner may permissibly pass on to its tenants. *See* Tex. Admin. Code § 24.121(c)(3) (defining a "customer service charge" as a "rate that is not dependent on the amount of water used through the master meter"); *see also* note 12. But the total monthly charge differs significantly depending on the size of the meter, from $25.70 for the smallest to $4,628 for the largest. (Dkt. 10, Ex. C). Determining how much each tenant at the MAH complex may have been permissibly billed by Defendants' passing on of this customer service charge would therefore require knowing both the size of the master meter at the property and the number of billable dwelling units between which to divide the corresponding monthly charge. *See* Tex. Prop. Code at § 24.124(c) (directing that a property owner must "bill each dwelling unit the amount of the customer service charge divided by the total number of dwelling units").

---

[12] Under TWC § 3.5031 and the associated PUC rules, owners are allowed to pass on the costs of a retail public utility's "dwelling unit base charge" and "customer service charge." Tex. Admin. Code § 24.124(b)–(c). A "dwelling unit base charge" is "[a] flat rate or fee charged by a retail public utility for each dwelling unit," and a "customer service charge" is "a rate that is not dependent on the amount of water used through the master meter." *Id.* at §§ 24.121(c)(3),(c)(5). When "the retail public utility's rate structure includes a dwelling unit charge, the owner shall bill each dwelling unit for the base charge applicable to that unit . . . [but not] for any dwelling unit base charges applicable to unoccupied dwelling units." *Id.* at §24.124(b). When it "includes a customer service charge, the owner shall bill each dwelling unit the amount of the customer service charge divided by the total number of dwelling units, including vacant units, that can receive service through the master meter serving the tenants." *Id.* at 24.124(c). Plaintiff does not brief this issue in detail, but it is clear from her calculations discussed *infra* that her point in determining the size of the master meter and estimating the non-water-use-based bill is to show that there is no explanation for the discrepancy between her estimate of what her allocated water usage should have cost and her actual bill. Defendant in turn does not brief this issue at all.

Plaintiff anticipated this issue and has used Conservice's "Water Base Charge" of $1.43 to deduce that the MAH complex most likely uses a 3" meter, which in turn means that the Austin Water monthly meter charge cannot explain the discrepancy previously identified. *See* (Dkt. 10, ¶ 48). She starts with her belief that the Water Base Charge is obtained by dividing the MAH complex's Austin Water monthly meter charge by the number of dwelling units. (Dkt. 10, ¶ 48). She also knows that the MAH complex has 268 dwelling units. (Dkt. 10, ¶ 48). Her conclusion that the MAH complex uses a 3" meter is therefore simple process of elimination: which meter size's monthly meter charge, divided amongst 268 dwelling units, yields the closest figure to the Water Base Charge? In this case, the Austin Water monthly meter charge of $366 for a 3" meter, divided amongst the 268 dwelling units at the MAH complex, returns a charge of $1.36 per dwelling unit—very close to the $1.43 Water Base Charge.

The Court finds Plaintiff's analysis convincing. The "Charge Explanations" sections of Plaintiff's Conservice Utility Statements explain that the "Water Base Charge" is "[w]ater service is provided by the City of Austin. You are charged based on a flat rate per unit for water availability." (Dkt. 10, Ex. B). This description fits with Plaintiff's belief that the Water Base Charge is derived from the Austin Water monthly meter charge. And while the Water Base Charge of $1.43, multiplied by 268 units, comes out to $383.24, which is greater than $366, that discrepancy is not necessarily troubling. As noted earlier, the City of Austin multifamily water customer total monthly meter charges are calculated by adding together the "Customer Charge," "Meter Charge," "Fire Protection Charge," and "Minimum Fixed Charge." (Dkt. 10, Ex. C). The first three amounts appear to be fixed, but the fourth, the "minimum fixed charge," suggests that the monthly meter charge total can be higher than that listed. *See* (Dkt. 10, Ex. C). It is therefore not surprising that there is a small difference between the real Water Base Charge of $1.43 and the hypothetical base charge of $1.36. Accordingly, the Court finds it plausible that an Austin Water monthly meter charge, divided

23

amongst the dwelling units at the MAH complex, cannot explain the difference between the $9.13 Plaintiff calculates she would owe purely for the water used and the $44.88 she was actually charged.

Plaintiff has also applied the same analysis to her wastewater charges. (Dkt. 10, ¶ 49). According to the Austin Water Rates document, wastewater is charged at a rate of $9.20 per 1000 gallons. (Dkt. 10, Ex. C). The 1430 gallons of water billed to Plaintiff for August, 2015, should therefore have cost $13.16 standing alone. (Dkt. 10, ¶ 49). The Austin Water Rates document also lists a flat monthly wastewater charge of $10.30. (Dkt. 10, Ex. C). $10.30 divided amongst the 268 dwelling units at the MAH complex yields a cost per dwelling unit of 3.8¢, which corresponds to the 4¢ "Sewer Base" charge in the Conservice Utility Statements. (Dkt. 10, Ex. B). But instead of $13.20 (volumetric cost plus sewer base cost), Plaintiff was billed a total of $67.66 for wastewater. (Dkt. 10, Ex. B at 4). The Court finds that Plaintiff's argument here is equally as persuasive as her argument regarding her water charges.

The Court therefore finds that Plaintiff has alleged sufficient facts from which it can reasonably infer that Defendants have done more than merely pass to her their charges from Austin Water.[13] Although Plaintiff's allegations are necessarily speculative to some degree, the Court does not believe that they fail to surpass the minimal degree of substance required at this point in the litigation. Without the opportunity to proceed to discovery, stating more specific allegations "may be nearly impossible at this stage." *Lahaye v. AstraZeneca Pharm. LP*, No. 14–00111–BAJ–SCR, 2015 WL 1935947, at *5 (M.D. La. Apr. 28, 2015); *accord Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004) ("'[I]nformation and belief' pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant.") (quoting 5

---

[13] Plaintiff does not mention the possibility that a "dwelling unit charge" makes up the difference, *see supra* note 12, and perhaps there may be other types of customer service charges hidden in the Conservice Utility Statement. But that is a question for discovery. The documents provided by Plaintiff—the Conservice Utility Statements and the Austin Water Rates document—do not mention any other fees that sound like they qualify to be passed on to tenants, and Defendants have failed to brief the issue beyond insisting that Plaintiff is speculating.

Wright & Miller, *Federal Practice & Procedure: Civil* § 1255 (2d ed. 1990). The Court therefore denies Defendants' motion to dismiss on the ground that Plaintiff's excessive fee claim is speculative.

### D. The Registration Claim

Plaintiff alleges that Defendants failed to register with the PUC and to submit a "PUCT Registration Form for Submetered or Allocated (FORM 10363)." (Dkt. 10. ¶ 53). She claims their failure to register is in violation of the PUC rules, which require that "[a]n owner who intends to bill tenants for submetered or allocated utility service or who changes the method used to bill tenants for utility service shall register with the executive director in a form prescribed by the executive director." Tex. Admin. Code § 24.122(a).

Defendants counter that the rule applies only to "owners setting up the billing program for a property for the first time." (Dkt. 12 at 11). Because Montecito purchased the property from a properly-registered prior owner, Defendants argue, they have not violated the rule. (Dkt. 12 at 11). To prove this, Defendants have attached to their motion scanned copies of the previous owner's registration forms filed with the Texas Commission on Environmental Quality, the regulatory predecessor to the PUC. (Dkt. 12, Ex. 2). Defendants otherwise concede that they have not registered with the PUC. *See* (Dkt. 12 at 11).

Plaintiff responds that it would be improper for the Court to consider Defendants' attached documentation. (Dkt. 15, at 18 n.8). The Court need not address that issue because the attached documents are irrelevant to the Court's decision. The administrative regulation in question states that "[a]n owner who intends to bill tenants for submetered or allocated utility service or who changes the method used to bill tenants for utility service shall register with the executive director in a form prescribed by the executive director." Tex. Admin. Code § 22.122(a). A plain reading of the language conveys that *any* owner who wishes to bill tenants must register with the PUC. It is not sensible to read the rule to suggest that it makes no difference how many subsequent owners a

property has as long as the first owner properly registers with the PUC. If Owner One sells a property to Owner Two, and Owner Two bills tenants for water and wastewater utility services, Owner Two has become "*an* owner who intends to bill tenants for . . . utility services . . . ." *Id.*

In the same vein, Subchapter H of the PUC's Substantive Rules Applicable to Water and Sewer Service Providers—titled "Water Utility Submetering and Allocation"—states that its purpose is "to establish a comprehensive regulatory system to assure that the practices involving submetered and allocated billing of dwelling units and multiple use facilities for water and sewer utility service are just and reasonable and include appropriate safeguards for tenants." Tex. Admin. Code § 24.121(a). This purpose would be stymied by a reading of the registration rules to require only an initial owner to register but no subsequent owners to notify the PUC when replacing the already-registered owner. Without a new owner's registration, the PUC would be ignorant as to what entity or individual was billing a property's occupants for utility services, which would hamper its ability to pursue regulatory action under the enforcement provisions of the TWC. *See e.g.*, Tex. Water Code § 13.411 (empowering the PUC to request the attorney general bring an action in the PUC's name against any person or corporation engaged in or about to engage in any act in violation of the TWC in order to effect compliance with the statute).

Defendants' motion to dismiss on the ground that they did not need to register with the PUC is therefore denied.

### E. The Breach of Contract Claim

Defendants' ground for dismissal of the breach of contract claim is predicated on their arguments that Montecito did not plausibly violate the PUC rules. (Dkt. 12 at 10). The lease states that Plaintiff's "monthly water and wastewater bill will conform to all applicable rules of the PUC" and that Plaintiff would be billed based on a calculation of her "submetered share of the master-metered water bill according to PUC rules." (Dkt. 10, Ex. A at 7). As already discussed, Plaintiff has

plausibly alleged that Defendants' billing did not conform to those representations. The motion to dismiss the breach of contract claim is therefore denied.

## IV. CONCLUSION

Defendants' Motion to Dismiss (Dkt. 12) is **DENIED**.

**SIGNED** on August 3, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE